32 A.3d 578 (2011)
423 N.J. Super. 320
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
V.T. and G.G., Defendants, and
R.S., Defendant-Appellant.
In the Matter of R.S., Minor-Respondent.
Docket No. A-2571-10T4
Superior Court of New Jersey, Appellate Division.
Submitted November 10, 2011.
Decided December 21, 2011.
*579 Joseph E. Krakora, Public Defender, attorney for appellant R.S. (Robert W. Ratish, Designated Counsel, on the brief).
Paula T. Dow, Attorney General, attorney for respondent New Jersey Division of Youth and Family Services (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Jaime E. Stofa, Deputy Attorney General, on the brief).
Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor respondent R.S. (Damen J. Thiel, Designated Counsel, on the brief).
Before Judges FUENTES, GRAVES and KOBLITZ.
The opinion of the court was delivered by
KOBLITZ, J.A.D.
R.S., father of R.S. (fictitiously, Robin), appeals the April 30, 2010 order finding that he neglected eleven-year-old Robin by testing positive for cocaine and marijuana at two visits supervised by the Division of Youth and Family Services (Division). After reviewing the record in light of the contentions advanced on appeal, we are constrained to reverse.
Robin was born in May 2000. R.S. is also the father of A.R., (fictitiously, Alan), a son born nine months after Robin to a different mother. Each child resides with their respective mother.[1]
*580 On September 13, 2001, R.S. pled guilty to two counts of possession of drugs with the intent to distribute on or near a school, N.J.S.A. 2C:35-7, and was sentenced to five years in prison. He was released from prison in May 2005.
The Division first investigated this family in September 2005, when R.S. and Robin's mother, V.T., argued during a visitation drop-off. At some point, R.S. grabbed and twisted Robin's arm. Robin's mother took her to the emergency room, where the doctor noticed redness and bruising on Robin's arm consistent with grabbing and reported the incident to the Division. The Division substantiated the abuse based on the accounts of Robin and V.T.,[2] and closed its case in December. After this incident, V.T. obtained a domestic violence restraining order against R.S.
On August 8, 2008, the South River Police Department reported to the Middlesex County Office of the Division that R.S. struck Alan's face and buttocks during a visit. R.S. admitted to the Division worker that he stopped the car and spanked Alan on his bare bottom. Alan confirmed the incident and stated that his father also slapped his face earlier that day. R.S. explained that Alan's grades were in jeopardy, and R.S. did not want him to fail out of school. He purchased extra workbooks for Alan, who had not completed the pages his father told him to complete. As punishment, R.S. spanked Alan. Robin was also present in the car.
R.S. acknowledged that he was corporally punished as a child. His caseworker recommended a course in parenting skills to educate him in proper child discipline techniques.
R.S. was subsequently charged with simple assault. The Middlesex County Family Court ordered the suspension of R.S.'s visits with Alan in an action commenced by Alan's mother. Although the Division substantiated abuse against Alan, it did not file a complaint for abuse and neglect.
Also in August 2008, Preferred Child Services (PCS) recommended that R.S. undergo Level 1 outpatient treatment for marijuana abuse. On January 8, 2009, the Division contacted R.S. about his failure to attend the recommended drug treatment. He stated that he completed parenting skills and anger management courses ordered by the family court, but refused to undergo a urine test and substance abuse treatment absent a court order.
As a result of R.S.'s refusal to submit to treatment and the fact that he had unsupervised overnight visitation with Robin from Thursdays until Sundays, the Division grew concerned for Robin's safety. On January 23, 2009, the Somerset County Office of the Division applied to the court for care and supervision over Robin under N.J.S.A. 9:6-8.21 to 8.73 (Title 9) and N.J.S.A. 30:4C-12 (Title 30). R.S. failed to appear at the hearing. The court ordered R.S. to attend domestic violence counseling, Level I outpatient substance abuse treatment, and to submit to an updated substance abuse evaluation. The court restricted his contact with Robin to visits supervised by the Division or its designee, with no overnight visitation.
R.S. began his Level I treatment in March 2009, at which time he tested positive for cocaine. He tested negative for drugs for the subsequent three weeks. In April 2009, the court held a case management hearing at which defendant was ordered *581 to continue Level 1 substance abuse treatment, to submit to urine testing, and to undergo domestic violence counseling. The court also approved supervised visitation with Robin once every two weeks. R.S. completed substance abuse treatment in July 2009.
In September 2009, the court permitted R.S. to see Robin on a weekly basis, provided the Division or a designee was present to supervise the sessions. At a supervised visit on November 6, 2009, R.S. provided a urine sample, which tested positive for cocaine and marijuana. His level of cocaine was reported as 871 ng/mL and 390 ng/mL for marijuana. R.S. visited with Robin on that date and the Division worker reported that R.S. behaved appropriately during the visit. The Division received the test results six days later.
At another visit on November 20, 2009, R.S. again tested positive for drugs. This time, his cocaine level was reported as 12,180 ng/mL and his marijuana level as 800 ng/mL. R.S. again had an uneventful supervised visit with Robin before the Division received the test results.
In February 2010, the Division amended its complaint to include defendant's criminal history and the results of these positive urine tests. The Division's complaint was amended again in March 2010 to include allegations that defendant visited with Robin while under the influence. A fact-finding hearing was subsequently held in April. At the hearing, Division caseworker Karen Lynch-Mattioli testified that she believed Robin was scared during the incident when R.S. spanked Alan in the car in August 2008. She did, however, acknowledge that her interview with Robin occurred three or four months later and she did not explicitly ask Robin about her feelings. She further admitted that Robin did not offer any insight as to her feelings on that day. Lynch-Mattioli stated that she arrived at her conclusion independently based on Robin's "verbal behaviors" and "demeanor" during the interview. Lynch-Mattioli also testified that she did not include her conclusion in her report because Robin was "very guarded" during their conversation and feared that she would not be able to see her father. Lynch-Mattioli further opined, "[t]here is no doubt in my mind that [Robin] loves her dad."
Division caseworker Sarah Perrot also testified that Robin "enjoys spending time with her father." She indicated that Robin "often speaks fondly of her father [a]nd indicates that she does look forward to visiting with him every Friday."
Robin told the Division that her visits "were going really well," and described a night out to the movies as "a lot of fun." She stated she felt safe at her father's house and that R.S. did drink beer once in a while, but she had never seen him drunk.
R.S. called the Division's transportation aide, Tanisa Robinson, to testify that R.S.'s visits with Robin went well. Robinson testified that R.S. makes sure Robin eats when he visits, he talks with her, and she is happy when she sees her dad. Robin remains happy even after the visits are over. Robinson also testified that if there was any indication that R.S. was under the influence at the time of the visits, they would have been terminated out of concerns for Robin's safety.
R.S. admitted at the hearing to using cocaine and marijuana two days prior to both his November 6 and November 20 visits with Robin. Although he acknowledged that cocaine stays in one's system for three days and marijuana for thirty days, he denied being impaired, as he indicated he "had a high tolerance level" for drugs and the "high" had passed when he went to the supervised visits.
*582 R.S. also stated that he no longer used corporal punishment because he learned alternative means of discipline through the courses he was attending.
The trial judge considered the testimony of the witnesses and documentary evidence. The judge found that R.S. used illegal drugs based on his own admission and the positive test results for cocaine and marijuana, and dismissed R.S.'s contentions that he was not under the influence while visiting with his daughter on November 6 and November 20, 2009. The judge noted that a parent who attends a supervised visit while under the influence of drugs places his child at a substantial risk of harm. The judge acknowledged he did not understand what the test results meant absent expert testimony, but found significant the recommendation given a few weeks after receipt of the tests results for R.S. to attend Level II.1 drug treatment, a higher level of out-patient treatment than previously suggested.
The judge rejected the allegations that R.S. posed a substantial risk of physical harm to Robin because he disciplined Alan in her presence. The judge concluded "there is no evidence of actual harm at all. All of the evidence supports that she is not afraid and that she has a good relationship with her father and wants to be with him."
The judge remained optimistic that R.S. could change, as he showed improvement as a parent after attending anger management, family violence and parenting courses. The judge noted R.S. understood the programs available to him and was "impressed" with "what [he has] seen" from R.S.
Notwithstanding R.S.'s improvement, the judge concluded that R.S. had exposed Robin to a substantial risk of harm during their supervised visits. He concluded the Division proved by a preponderance of the evidence that R.S. neglected Robin. He based his decision only on R.S.'s refusal to attend substance abuse treatment and his positive test results on November 6 and November 20, 2009. The judge explained:
I conclude as a matter of law that when one goes to a supervised parenting session to be with his daughter that and he ishas the marijuana or the cocaine in his body, and certainly to the levels of this defendant so as not to maketo paint with too broad a brush, I will say in this case, given the levels, that he did place his daughter at substantial risk of harm by virtue of his coming into the setting when he should have stayed out and not exercised his parenting time.
On December 8, 2010, the litigation was terminated. R.S. was permitted one supervised visit every other week, with any further litigation to proceed in Family Court through a non-dissolution case.
On appeal, R.S. raises the following issues,
POINT I:
THE STATE DID NOT PROVE BY A PRE[P]ONDERANCE OF EVIDENCE THAT THE DEFENDANT CREATED A RISK OF HARM TO THE CHILD.
A. The record lacks substantial credible evidence to support a finding that Robin is, or was during the two November DYFS-supervised visits at issue, in imminent danger of becoming physically, mentally or emotionally impaired.
B. The record lacks evidence to support a finding that the defendant was under the influence of illegal controlled substance when he visited his daughter.
The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to *583 determine whether a child is an abused or neglected child[3] pursuant to N.J.S.A. 9:6-8.44. See N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J.Super. 551, 581-82, 2 A.3d 1138 (App.Div.2010). Under the statutory framework, "the safety of the child shall be of paramount concern." N.J.S.A. 9:6-8.28(a), -8.31(a), -8.32, -8.49. At the hearing, the State must prove by a preponderance of the evidence that there has been an act of abuse or neglect committed by the parent or other person charged with a legal duty of care for the minor child. N.J.S.A. 9:6-8.46. "If facts sufficient to sustain the complaint under [Title 9] are not established, or the court concludes that its assistance is not required on the record before it, the court shall dismiss the complaint and shall state the grounds for the dismissal." N.J.S.A. 9:6-8.50(c). However, if the facts are sufficient to sustain the complaint, the court will enter an order finding that the child is abused or neglected and set forth the grounds for such a finding. See N.J.S.A. 9:6-8.50(a). The judge "must articulate, with particularity, the facts upon which a determination of abuse and neglect is made" and "clearly identify all documentary exhibits relied upon in reaching his or her decision." See N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J.Super. 245, 265, 800 A.2d 132 (App. Div.2002).
The Supreme Court has held that a parent fails to exercise a minimum degree of care where a parent knows of the dangers inherent to a particular situation. G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82, 723 A.2d 612 (1999). "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation. . . . Ultimately, we leave it to [the Division] and the courts to determine, on a case-by-case basis, whether a caregiver has failed to exercise a minimum degree of care in protecting a child." Ibid. The Court further reasoned:
[T]he inquiry should focus on the harm to the child and whether that harm could have been prevented had the guardian performed some act to remedy the situation or remove the danger. When a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law.
[Id. at 182, 723 A.2d 612.]
Title 9 governs abuse and neglect proceedings. See N.J.S.A. 9:6-8.21 to 8.73. The drafters of Title 9 intended the following:
[T]o provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected.
[G.S., supra, 157 N.J. at 171, 723 A.2d 612 (quoting N.J.S.A. 9:6-8.8).]
When determining whether or not a child has been abused or neglected, the trial court must base its findings on the totality of the circumstances, since "[i]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be `substantial' *584 or the sum of many acts may be `substantial.'" Dep't of Children & Families, Div. of Youth & Family Servs. v. C.H., 414 N.J.Super. 472, 481, 999 A.2d 501 (App. Div.2010) (internal quotations omitted).
The Division can make a prima facie case of abuse or neglect by "proof of injuries sustained by a child or of the condition of a child of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or guardian." N.J.S.A. 9:6-8.46(a)(2). Importantly, "[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383, 736 A.2d 1261 (1999). Fact-finding hearings are critical in establishing whether a child has been abused or neglected, and such a determination must be based on "competent, reliable evidence." J.Y., supra, 352 N.J.Super. at 264-65, 800 A.2d 132.
Although we defer to the trial court's findings of fact, especially when credibility determinations are involved, we do not defer on questions of law. N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J.Super. 81, 88-89, 906 A.2d 463 (App. Div.2006). At the pretrial conference preceding the fact-finding hearing, the trial judge noted that the 2005 arm-twisting incident was not a part of the current fact-finding. He also noted that defendant's criminal and domestic violence history was not a basis for a finding of abuse or neglect because such a finding requires that the child be involved. We agree with these observations and also accept the trial judge's factual findings that R.S. did not fully cooperate with recommended drug treatment and tested positive for cocaine and marijuana at two supervised visits.
However, we disagree that such behavior inherently created a substantial risk of harm to Robin. Drug rehabilitation does not generally progress without incident. See Honorable Anthony J. Sciolino, Symposium: Advocating For Change: The Status & Future Of America's Child Welfare System 30 Years After CAPTA: The Changing Role Of The Family Court Judge: New Ways Of Stemming The Tide, 3 Cardozo Pub.L. Pol'y & Ethics J. 395, 400 (2005) ("[R]elapse and intermittent progress are part of most successful drug rehabilitations."). Although R.S. completed a drug program, he subsequently tested positive for illegal substances. Addiction is not easy to successfully remediate; a failure to successfully defeat drug addiction does not automatically equate to child abuse or neglect.
Absent expert evidence, the State is unable to demonstrate whether or not R.S. was impaired to the point of posing a risk to Robin in a supervised setting. The level of drugs in his system is not explained and, as the trial judge acknowledged, absent expert testimony the meaning of the reported levels is unclear.
R.S. testified he ingested the drugs two days prior to each visit. There is no evidence to contradict this testimony. Contrary to the trial judge's conclusion, use of illegal drugs days prior to a supervised visit does not as a matter of law constitute neglect. The State was unable to demonstrate any risk, let alone one of a substantial nature, to eleven-year-old Robin in such a circumstance. Unlike with an infant, Robin was not vulnerable during these visits to the slightest parental misstep. Moreover, the Division reported that R.S. behaved appropriately at both visits and demonstrated no indicia of impairment.
We recognize that the use of illicit drugs is illegal and that a parent should not exercise visitation, even supervised visitation, while impaired. However, Title 9 is *585 not intended to extend to all parents who imbibe illegal substances at any time. The Division would be quickly overwhelmed if law enforcement was required to report every individual under the influence who had children.
We acknowledge that R.S. had a substantiated complaint in 2005 for twisting Robin's arm and a 2008 substantiated complaint for using excessive corporal punishment against Alan. However, the Division's current complaint, which asserts both R.S.'s failure to comply with recommended drug treatment and, more particularly, his positive urine tests at two supervised visits, does not constitute abuse or neglect as a matter of law.
Subsequent to the fact-finding hearing, the Division's complaint was dismissed. R.S. is already on the child abuse registry based on the two prior substantiated complaints. While our decision may have little practical import for the parties involved, it is important to make clear that not all instances of drug ingestion by a parent will serve to substantiate a finding of abuse or neglect.
Reversed.
NOTES
[1] Robin's grandmother has physical custody of Robin, although Robin's mother also lives in the household.
[2] R.S. did not appeal this substantiation and thus is listed on the child abuse registry. N.J.S.A. 9:6-8.11.
[3] "Abused or neglected child" is defined in N.J.S.A. 9:6-8.21(c).